Kimberly Anne Tadlock BRUNER *v.* Charlie E. TADLOCK
and Loretta G. Tadlock

99-8 991 S.W.2d 600

Supreme Court of Arkansas
Opinion delivered June 10, 1999

*Bethell & Cromwell PLC*, by: *Jan Rose Cromwell*, for appellant.

*Bob Keeter*, for appellees.

TOM GLAZE, Justice. Appellees Charlie and Loretta Tadlock are the paternal grandparents of Brittney, who was five years old when her father, Michael, died on August 15, 1997. Appellant Kimberly Tadlock, mother of Brittney, was married to but was estranged from Michael at the time of his death. On September 1, 1997, Kimberly, who had been residing in Sevier County, moved to Poteau, Oklahoma with Brittney. She later married Dean Bruner, and at some stage, she, Dean, and Brittney established their residence in Tulsa, Oklahoma. Dissatisfied with not being able to visit with Brittney after her removal to Oklahoma, Charlie and Loretta filed a complaint in the Sevier County Chancery Court on December 1, 1997, and requested

that a visitation schedule be established so they could maintain a relationship with Brittney. On January 5, 1998, Kimberly filed a motion to dismiss the Tadlocks' complaint seeking grandparents' visitation rights, and asserted that the chancery court lacked subject-matter and personal jurisdiction and exercised improper venue. In short, Kimberly cited Ark. Code Ann. § 16-60-116 (1987), and contended that, to obtain visitation rights, the Tadlocks must file their complaint in Oklahoma where Kimberly and Brittney now reside.

The chancery court held a hearing whereby it ruled the court had jurisdiction. Later, after hearing testimony on the merits, the chancellor decided it was in Brittney's best interest and welfare to have visitation scheduled with her paternal grandparents, the Tadlocks. The trial court entered two separate orders deciding these issues on September 10, 1998. In her appeal, Kimberly does not challenge the chancellor's decision establishing visitation periods for the Tadlocks and their granddaughter, Brittney. Instead, she limits her point for reversal only to whether the chancellor erred in finding that his court had jurisdiction to award grandparents' visitation rights in these circumstances.

In concluding it had jurisdiction, the chancery court referred to the Uniform Child Custody Jurisdiction Act (UCCJA) (Ark. Code Ann. §§ 9-13-201 -227 (Repl. 1998)), particularly § 9-13-202 and 203, which provide for custody and visitation determinations when contestants claiming rights are located in different states. Simply put, the chancellor, utilizing the UCCJA, determined that his court had jurisdiction because Arkansas was Brittney's home state since she had resided here for more than six months preceding the Tadlocks' commencement of this suit seeking visitation. See Ark. Code Ann. § 9-13-203(a)(1)(i) (A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if this state is the home state of the child at the time of commencement of the proceeding). Under the UCCJA, "home state," in relevant part, is defined as the state in which the child immediately preceding the time involved lived

with his parents, a parent, or a person acting as a parent, for at least six consecutive months. We believe the chancellor correctly ruled that he had jurisdiction under the UCCJA, but we also hold that the trial court has jurisdiction under the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A (1989 and Supp. 1999).

Initially, we note that the Tadlocks filed their suit seeking visitation by relying on Ark. Code Ann. § 9-13-103(a)(1)(A) (Repl. 1998). That statute empowers a chancery court to grant grandparents visitation rights with their grandchildren where the child's parents' marital relationship has been severed by death, divorce, or legal separation. Section 9-13-103(a)(2) provides such visitation rights may only be granted when the court determines visitation would be in the child's best interest and welfare.

While acknowledging § 9-13-103 affords the Tadlocks the right to bring an independent action for visitation after their son, Michael, died, Kimberly argues that neither the UCCJA nor the PKPA was intended to grant grandparents such a remedy against an out-of-state parent like Kimberly. Kimberly presents no cases to support her argument, and our research reveals none. However, we believe the plain language in both the UCCJA and the PKPA supports upholding the Tadlocks' action against Kimberly.

In this respect, and as mentioned previously, § 9-13-203(a) of the UCCJA provides that a court in this state has jurisdiction to make a child custody determination by an initial decree, and Ark. Code Ann. § 9-13-202(2) (Repl. 1998) further provides that "custody determination" means a court decision and court orders and instructions providing for the custody of a child, *including visitation rights*; it does not include a decision relating to child support or any other monetary obligation of any person. (Emphasis added.) Moreover, a "contestant" in UCCJA cases is defined to mean *a person*, including a parent, *who claims a right to custody or visitation rights* with respect to a child. Ark. Code Ann. § 9-13-202(1) (Repl. 1988) (emphasis added).

 In addressing whether the UCCJA is intended to establish jurisdiction in original visitation actions as the one before

us, it is helpful to consider the PKPA. As we recently stated in *Hudson v. Purifoy*, 337 Ark. 146, 986 S.W.2d 870 (1999), the UCCJA governs state conflicts over child-custody jurisdiction, but where the UCCJA and PKPA conflict, the PKPA controls. As is the case with the UCCJA, the PKPA applies to all interstate "custody determinations," which include disputes regarding visitation. *See* 28 U.S.C. § 1738A(b)(3) (1989); *see also* JEFF ATKINSON, MODERN CHILD CUSTODY PRACTICE § 3.10, at 125-126 (1986). The author of the Modern Child Custody Practice treatise summarized the purposes of the UCCJA and the PKPA as follows:

> *Both acts are designed* to serve several purposes: to promote cooperation between states, to avoid relitigation and conflicting custody orders, to facilitate interstate enforcement of custody orders, to deter child abductions and improper retention of children, and to promote uniformity in jurisdictional laws *so that custody and visitation may be determined in the state which can best decide the interest of the child. Id.* at 105. (Emphasis added.)

■ In November 1998, the Congress enacted Public Law No. 105-374, whereby it added in section 1 language that explicitly provides that the PKPA covers initial visitation determinations, and inserted language to clarify that a "contestant" under the Act means both a parent or grandparent who claims a right to custody or visitation with a child. *See* U.S.C.A. § 1738A(a) and (b)(2), and (9) (1989 and Supp. 1999). Consistent with the statutory language of the PKPA as amended, Congress' members intended to make it clear that, by enacting Public Law No. 105-374, the full faith and credit law includes visitation orders. For example, Senator Biden recorded that, in a narrow sense, Public Law No. 105-374 does nothing different than current federal law, but by making that law (PKPA) more explicit, it hopefully will eliminate the hassles, obstacles, and delays that too often confront those who have valid visitation orders and are asking only that federal law be followed. *See* 144 CONG. REC. 151, S12941 (daily ed. Oct. 21, 1998); *see also Brock v. Pierce County*, 476 U.S. 253, 263 (1986) (Court recognized that statements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide

evidence of Congress' intent). In sum, we interpret both the UCCJA and the PKPA to provide the Sevier County Chancery Court with the authority and jurisdiction to award the Tadlocks visitation rights with Brittney because Brittney's home state under those Acts is Arkansas.

■ At this point, we note that, even if we had interpreted the UCCJA and the original version of the PKPA not to include initial visitation orders, Kimberly's argument would still fail. As discussed above, the PKPA, as amended by Public Law No. 105-374, now very specifically provides that initial visitation orders are obtainable and enforceable under the Act. While Public Law No. 105-374 was enacted about two months after the Tadlocks obtained their visitation orders, the law is remedial and should be given a retrospective effect whenever such seems to have been the intention of the Legislature. *Barnett v. Arkansas Transp. Co.*, 303 Ark. 491, 798 S.W.2d 79 (1990). In *Barnett*, the court repeated the settled rule as follows:

> The rule by which statutes are construed to operate pro-spectively does not ordinarily apply to procedural or remedial legislation. 'The strict rule of construction contended for does not apply to remedial statutes which do not disturb vested rights, or create new obligations, but only supply a new or more appro-priate remedy to enforce an existing right or obligation. . .' *Id.* at 497, 798 S.W.2d at 83 (citing *City of Fayetteville v. Bibb*, 30 Ark. App. 31, 781 S.W.2d 493 (1989) (quoting *Harrison v. Matthews*, 235 Ark. 915, 362 S.W.2d 704 (1962)); *see also* SUTHERLAND STAT. CONST. § 60.1 (5th ed. Rev. 1992) (many statutory issues relating to family law are considered remedial).

■ ■ In the instant case, Public Law No. 105-374 does not diminish or disturb Kimberly's custody rights of Brittney, but merely assures the Tadlocks a remedy to enforce their rights of visitation with Brittney which the Tadlocks were awarded under § 9-13-103. In other words, the Tadlocks, as grandparents who have been granted visitation rights with their granddaughter, will be assured that their visitation order will be afforded full faith and credit even though the custodial parent removed her child to another state.

■ Finally, we address Kimberly's argument that the Sevier County Chancery Court's order granting the Tadlocks visitation must fail because the court had no personal jurisdiction over her. As pointed out in Dr. Robert A. Leflar's treatise, AMERICAN CONFLICTS OF LAW, "Relationships with Children," § 243, at 679 (4ᵗʰ ed. 1986), the UCCJA provides for notice and an opportunity to be heard, but does not require "technical personal jurisdiction, on the traditional theory that custody determinations, as distinguished from support actions, are proceedings *in rem* or proceedings affecting status." The UCCJA's and the PKPA's basic jurisdictional concept is that the child's "home state" should have preeminent authority to determine custody and visitation and that authority should be respected elsewhere. *Id.* at 677.

Dr. Leflar's treatise, however, cites *May v. Anderson*, 345 U.S. 528 (1953), for the proposition that a parent's legally protectible interest in his or her child's custody has enough importance that the due process clause may not permit the interest to be cut off by a court which has no jurisdiction over the objecting parent. *Id.* at 679. Leflar quickly adds, though, that the development of long-arm jurisdiction in family matters solves the problem raised by *May v. Anderson* in some cases, but not all. *Id.* at 680. He further states that, in spite of the adoption of the PKPA, a definitive solution awaits a ruling by the United States Supreme Court. *Id.* Most telling, we think, is Leflar's added remark that "Meanwhile the exercise of custody jurisdiction without personal jurisdiction over a nonresident parent remains vulnerable in theory, *though less so in practice.*" *Id.* (Emphasis added.)

■ Whatever the outcome of the personal-jurisdiction problem attributed to the *May v. Anderson* decision, we conclude Arkansas's long-arm statute, which includes matters concerning domestic relations, *see Bunker v. Bunker*, 261 Ark. 851, 552 S.W.2d 641 (1977), provides for personal jurisdiction over Kimberly even though she has removed Brittney from Arkansas to reside in another state. *See also* Ark. Code Ann. § 16-58-120 (Supp. 1997) (Any cause of action arising out of acts done in this state by an individual in this state may be sued in this state,

although the defendant has left the state). As stated in *Bunker*, the basic test in determining if Arkansas retains jurisdiction over a nonresident defendant is whether the defendant's contacts within the state were such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. 261 Ark. at 853, 552 S.W.2d at 642.

Here, Kimberly's matrimonial domicile was in Arkansas, where thereafter she and Michael lived until he died. During the more than five years Kimberly, Michael, and Brittney resided in Arkansas, Brittney had a close relationship with her grandparents, and Brittney also had a relationship with other members of her father's extended family. Kimberly's and Brittney's family and personal contacts with Arkansas ended only when Kimberly decided after Michael's death to live in Oklahoma. Considering these important contacts, we see no good reason for not recognizing Arkansas's personal jurisdiction over Kimberly in this case.

In conclusion, we hold the Sevier County Chancery Court had subject-matter and *in rem* jurisdiction of this visitation proceeding under the express terms of the UCCJA and PKPA, and in addition, if required by the due process clause, the court had personal jurisdiction over Kimberly even though she moved her residence to Oklahoma two weeks after Michael's death and three months prior to the Tadlocks filing this case.[1] Accordingly, we affirm.

---

[1] While Kimberly also mentioned the trial court's lack of venue in her motion to dismiss, that issue was not specifically ruled on below, perhaps because she relied on her jurisdictional issues and arguments. Since Kimberly's last residence in this state was in Sevier County, there is little doubt that, providing Arkansas had jurisdiction of this matter, venue rested in that county. *See* Ark. Code Ann. § 16-60-116 (1987).